**Craig C. HUNSBERGER, Appellant (Petitioner Below),**

v.

**Tammy A. HUNSBERGER, Appellee (Respondent Below).**

No. 33A04–9402–CV–45.

Court of Appeals of Indiana.

July 6, 1995.

Rehearing Denied Sept. 12, 1995.

George A. Lohmeier, Indianapolis, for appellant.

Thomas L. Raisor, Muncie, for appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Craig Hunsberger appeals the trial court's judgment which 1) awarded sole custody of the parties' child to Tammy Hunsberger, and 2) found the parties' antenuptial agreement to be invalid and unenforceable. We affirm in part, reverse in part, and remand.

### ISSUES [1]

I.  Did the trial court abuse its discretion in awarding sole custody of the parties' child to Tammy?

II.  Did the trial court err in finding the antenuptial agreement to be invalid and unenforceable?

### FACTS

Craig and Tammy Hunsberger were married on November 22, 1986. Craig was 40 years old, and Tammy was 27. It was the second marriage for both parties, and neither

---

1.  Craig also argues that the trial court abused its discretion in distributing the property of the marital estate pursuant to Ind.Code 31–1–11.5–11. Because we find that the trial court erred in finding the antenuptial agreement to be invalid and unenforceable, and remand for a redistribution of property consistent with this opinion, we need not address this issue.

had children from the previous marriages. At the time of the marriage, Craig owned his home, furniture and household goods. He also had cash assets of approximately $130,-000, most of which were maintained in I.R.A. accounts or tax deferred annuities.[2] Tammy owned her car and some household furniture.

Approximately two and one-half weeks prior to the marriage, at Craig's request, he and Tammy met with Perry Cross, a Muncie attorney who had represented Craig in his previous divorce, to discuss an antenuptial agreement. According to Craig, during the meeting, he told Tammy that the value of his cash assets was between $100,000 to $150,-000. In contrast, Tammy testified that the amount of Craig's savings was never mentioned. Because Cross was unavailable to testify at trial, Craig and Tammy stipulated to the notes that Cross took during the meeting, and the notes were admitted into evidence.[3] The parties executed the antenuptial agreement on November 11, 1986, eleven days prior to the marriage. The agreement provided that in the event of divorce, each party would keep the property that 1) he or she brought into the marriage, and 2) obtained in his or her name after the marriage. The agreement further provided that any furniture or household goods acquired during the marriage, except Craig's personal effects, would be distributed to Tammy in the event of dissolution.

In June, 1987, Craig and Tammy purchased 27 acres of land, which included an old farm house, for $60,000. Craig withdrew money from his savings, and paid a $20,000 down payment. A $40,000 loan was jointly

incurred by Craig and Tammy. Craig and Tammy began construction of a new home on the property in June 1988. Craig again withdrew money from his savings, and paid a $40,000 down payment. An $80,000 loan was jointly incurred by Craig and Tammy.

During the course of the marriage, Craig and Tammy were both employed—Craig as an elementary school teacher and a pilot in the United States Air Force Reserves, and Tammy as a secretary. Craig and Tammy maintained separate checking accounts. It appears that Craig was responsible for the parties' finances, and Tammy paid him $220.00 per month as her financial contribution to the parties' joint monthly expenses. Craig and Tammy's son, Taylor, was born in January 1988.

Craig filed a dissolution of marriage petition on April 7, 1992, after hiring a private investigator to confirm his suspicion that Tammy was seeing another man. Craig and Tammy continued to reside together until July 1992, when Craig moved out of the parties' home.[4] Tammy relinquished possession of the residence to Craig in October 1992. During the separation, the parties agreed to a split custodial arrangement. Tammy and Craig each had custody of Taylor for alternating five-day periods. Neither parent paid child support.

During the pendency of the proceedings, Margaret Purvis conducted a custody evaluation, and made recommendations to the court. According to Purvis' evaluation, which was based on individual testing, inter-

---

2. Craig testified that he had accumulated these funds during the eight years that he was on active duty in the United States Air Force. According to Craig, saving money was his "primary emphasis while [he] was on active duty so that [he] could build up a method of security for later in life." R. at 412.

3. The copies of these notes in the record are virtually illegible. Apparently the notes submitted to the trial court were also illegible because the trial court's order provides in pertinent part as follows:

   Mostly illegible copies of notes purportedly made by him on that date of November 5, 1986, and later on November 11, 1986, the date the parties signed the agreement, appear,

however, to indicate that the husband may have made some disclosure of his assets at the time of the meeting and arrangement. The aforementioned copies of such notes presumably taken by Mr. Cross during his appointments with the parties appear to indicate that the figures of 100,000.00 to $150,000.00 were specifically mentioned by the husband. The husband confirms that indication, but the wife adamantly contends that no figures were mentioned during either appointment with Mr. Cross and, as a result, there was no disclosure of assets by the husband. R. at 211.

4. Despite the pending dissolution of their marriage, Craig and Tammy had decided to continue to reside together to maintain as much stability as possible in Taylor's life.

views of both parents, and observations of the child while in the care of each parent, Craig had provided equal, if not more direct parenting of Taylor. Purvis recommended that the parties share joint custody of Taylor. Specifically, Purvis recommended that Craig have physical custody of Taylor during the school year, and that Tammy have physical custody of Taylor during the summer, with a liberal visitation and holiday schedule for each parent. Purvis was not called to testify at trial.

After a four-day hearing, two days in January 1993 and two days in April 1993, the trial court issued its order. The trial court awarded Tammy sole custody of Taylor, and ordered Craig to pay $138.00 per week in child support. In addition, the court found that the parties' antenuptial agreement was invalid and unenforceable, and distributed the parties' property pursuant to Ind.Code 31-1-11.5-11. Craig was awarded 1) the marital residence appraised at $205,000.00,[5] 2) his school pension valued at $12,000, 3) his Air Force pension which was not assigned a value because it had not yet vested, 4) tax refunds totaling $1,680.00, 5) his vehicle, 6) furniture and other personal property, and 7) his remaining savings valued at 97,551.00. Craig was also ordered to pay the following debts: 1) $36,882.36 Bank One Mortgage, 2) $77,908.14 Americana Mortgage, 3) $8,804.50 line of credit, and 4) $72,000.00 gross payment to Tammy. Tammy was awarded 1) her bank account containing $1,900.00, 2) her pension valued at $7,000.00, 3) her vehicle, 4) furniture and other personal property, and 5) the $72,000.00 gross payment from Craig. The sole debt that she was ordered to pay was $1,648.00 which she owed to Craig for household expenses.

Craig now appeals those parts of the court's order which 1) awarded sole custody of Taylor to Tammy, and 2) found that the parties' antenuptial agreement was invalid and unenforceable.

## DECISION [6]

### I. Child Custody

Ind.Code 31-1-11.5-21 states in pertinent part as follows:

(a) The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there shall be no presumption favoring either parent. The court shall consider all relevant factors including:

(1) The age and sex of the child;

(2) The wishes of the child's parent or parents;

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(5) The child's adjustment to his home, school, and community; and

(6) The mental and physical health of all individuals involved.

We review a trial court's custody decision for an abuse of discretion. *Warner v. Warner* (1989), Ind.App., 534 N.E.2d 752, 754. We will reverse a trial court only where the result reached is clearly against the logic and effect of the facts and circumstances before the court. *Id.* We can not and will not reverse a trial court on the basis of conflicting evidence. *In Re Marriage of Julien* (1979), Ind.App., 397 N.E.2d 651, 653.

5. Tammy did not want the parties' house. She testified that it had been Craig's idea to build the house in the country, and that she had wanted to stay in town in the house that Craig owned when the parties got married. In addition, Tammy proposed to the trial court that the house be awarded to Craig.

6. We admonish Craig's counsel that Ind.Appellate Rule 7.2(A)(3)(a) requires notations on the margins of each page of the transcript indicating the name of each witness and whether the examination is direct or cross. If counsel had complied with this rule, and made notations on the margins of the 1266 page, five volume record, counsel would have facilitated our task. However, counsel's error does not prevent us from reaching the merits of the appeal. *See, Sand Creek v. Finch* (1995), Ind.App., 647 N.E.2d 1149.

Even if the evidence might support a conclusion different than the one reached by the trial court, we will not substitute our judgment for that of the trial court. *Id.* In addition, because it is our duty to affirm the trial court's decision if it is supported by the evidence or its reasonable inferences, we view the evidence and its reasonable inferences in a light most favorable to the trial court's judgment. *Warner,* at 754.

Craig argues that the trial court abused its discretion in awarding sole custody of Taylor to Tammy. Specifically, Craig argues that the child custody order awarding Tammy sole custody of Taylor was based upon a presumption in favor of Tammy in violation of I.C. 31-1-11.5-21. In support of his argument, Craig refers us to *Brokus v. Brokus* (1981), Ind.App., 420 N.E.2d 1242, and *In Re Marriage of Myers* (1979), 180 Ind.App. 284, 387 N.E.2d 1360. However, both of these cases are distinguishable from the facts before us. In *Myers,* Bruce and Laura Myers agreed that Bruce would file a petition seeking dissolution of the parties' marriage, and that he would retain custody of the parties' son. At the close of evidence at the dissolution hearing, the trial court stated as follows:

> There is no doubt in the Court's mind about the competency or the genuine concern of the mother, Laura, or the father to take care of his son. There never was a question with the Court as to if he is a competent person to take care of his child. There has quite candidly been some concern as far as the Court is concerned as to the mother to take care of the child solely because of the evidence that came out at trial, and you have had the hearing, and we devoted a great number of hours to this case....
>
> However, all this necessarily comes down to one question here, and that is the mental capacity of the mother to discharge her duties as a mother, and the Court's decision as to who is the best in the long run for this boy.

*Id.* 387 N.E.2d at 1363.

The court awarded custody of the child to Laura. Bruce filed a motion to correct errors, attaching the sworn affidavit of Thomas C. Sopko, the attorney who represented him

at trial. Sopko's affidavit described a conversation that he had with the trial court two days after the parties had rested their respective cases. According to Sopko, the trial court notified the attorneys of its decision to award custody of the parties' child to Laura. Sopko conferred with the trial court and reported as follows in his affidavit:

> 11. That during the course of said conversation, the Judge, indicated to the undersigned that the only testimony that the Court was actually concerned with was the testimony of the two (2) psychiatrists who testified on the last day of the series of the aforementioned hearings.
>
> 12. That additionally, the Judge also indicated to the undersigned that while the Judge was familiar with the present status of the Dissolution of Marriage Act which sets forth that there no longer is any presumption favoring the mother in the determination of child custody, that he was of the personal opinion that the mother should be given the benefit of the doubt.
>
> 13. That the Judge went on to further relate that it was his personal opinion that in most instances that the mother is the more appropriate custodial parent....
>
> 16. That the Judge indicated to the undersigned that ... in the Judge's opinion it had been 'an abnormal situation' wherein the father had custody of the child during the pendency of these proceedings.
>
> 17. That once again ... the undersigned had additional discussions with the Court concerning a father being awarded custody of his children, and again the Judge indicated that it was his opinion that in most situations, the mother is, and should be, presumed to be a more fit and proper person to be the custodial parent.

*Id.* at 1361-62.

This court reviewed the trial transcript and Sopko's affidavit, and responded as follows:

> The trial judge was bound to render his custody decision in accordance with [Ind. Code 31-1-11.5-21]. However, Judge Hosinski's remarks to Sopko indicated that he was unable or unwilling to do so—he personally presumed that in most instances

the mother is the more fit and proper custodial parent, and that the mother should be given "the benefit of the doubt." ... Apparently the judge would have given Bruce custody of Keith only if he had found Laura mentally incapable of caring for Keith.... After a careful examination of the record, it is apparent to this Court that the trial judge could have rendered his custody decision only because he had acted under the presumption that the mother is the more fit and proper custodial parent. The trial judge abused his discretion by indulging in a statutorily-prohibited presumption and by rendering a custody decision that does not appear to be in the best interests of the child.... The record fails to provide support for the trial judge's decision to award custody of Keith to Laura, in the absence of a presumption in her favor.

*Id.* at 1363–64.

In *Brokus, supra,* during opening statements, prior to the introduction of evidence, the following colloquy occurred between father's counsel and the court:

FATHER'S COUNSEL: [Father] has a desire to have custody of the children if that's the case.

COURT: You can't take two or three year old girls away from their mother. I don't see what his end result is, without building up a lot of attorney fees, two different states. The outcome eventually will be to dissolve the marriage either here or in Ohio and I'm sure she's going to obtain custody of the twins, born—was that '70.

*Brokus,* 420 N.E.2d at 1249.

In *Brokus,* we cited *Myers, supra,* and noted that the circumstances in *Brokus* were "far more flagrant and prejudicial" because the statements were made in court prior to the introduction of evidence. *Id.* We reversed the trial court's judgment, which had awarded custody of the parties' children to their mother, holding that the "partial manner in which the trial court conducted this hearing, in effect, denied Robert of his right to a fair trial." *Id.*

7. Tammy's brief includes an appendix which is a "complete reference guide" to the trial court's

Here, Tammy notes that both *Myers* and *Brokus* involve direct statements made by the court. Tammy further notes that the trial court in this case "never—not once—made any statement or comment of any kind that directly suggested, or could be interpreted by anyone to suggest, that he would favor the mother over the father when it came time to award custody of Taylor to one of them."[7] Tammy's Brief, p. 18–19.

Anticipating Tammy's argument, Craig has directed us to the trial court's Findings of Fact and Conclusions of Law, which, according to Craig, are "replete with illustrations of the trial court's predisposition to presume that in a child custody dispute, mothers should get custody and fathers visit." Craig's Brief, p. 28.

We first observe that the trial court's findings state in pertinent part as follows:

In determining [the best interests of the child], the court should not, and has not in the instant case, presumed to favor either parent. The court should, moreover, consider all relevant factors including those specifically designated in [Ind.Code 31–1–11.5–21].

R. at 196. In addition, our review of both the record and the trial court's findings reveals that Craig is inviting us to substitute our judgment for that of the trial court. This we can not do. *See, Julien, supra.*

Here, the trial court clearly complied with I.C. 31–1–11.5–21, as evidenced by the court's findings which state in pertinent part as follows:

5. With respect to [Ind.Code 31–1–11.5–21], the Court finds as follows:

a. With respect to the age and sex of the child, Taylor, ... is a male child now five (5) years of age.

b. With respect to the wishes of the child's parents, the Court finds that both parents very much want the child to be in their sole care and custody....

c. With respect to the wishes of the child himself, he again is only five (5) years of

rulings and comments. Tammy's Brief, p. 30.

age and has not expressed any desires he might have with respect to this issue of great importance.

d. With respect to the interaction and interrelationship of the child with the parties and any other persons who might significantly affect the child's best interests, the Court refers to the text of the evaluation provided by the Court-appointed custody/visitation evaluator, Margaret Purvis, in her October 20, 1992, report to the Court.... [T]he evaluator offers her opinion that the husband has provided equal, if not more, direct parenting of the child but cautions that that does not mean that the wife is incapable of doing the same. The Court, does not, however, share that opinion, and, moreover, is strongly of the opinion that the evidence presented at extended proceedings in this cause supports and reinforces the Court's own finding that it has been the wife who has been the primary caretaker of the child throughout the child's short life.... Such opinions and findings of the court are based on the court's observations of all witnesses' demeanor while testifying and a consideration of their testimony in light of all evidence presented over four (4) days of Final Hearing proceedings. Mrs. Purvis saw only the parties—and then only for brief interview and observation periods. She did not have before her the quantity of evidence presented to the Court. Thus while the Court shares many of her observations and opinions, it does not share her briefly-stated conclusions.

e. With respect to the child's adjustment to his home, school and community, the Court finds that the husband will, by agreement, receive possession of the marital residence.... Given these circumstances, custody with the husband would admittedly provide Taylor with the familiarity of his own home surroundings. That might assist his adjustment to his parents' divorce. Custody with his mother would, on the other hand, necessitate adjustment at some point to new and unfamiliar territory. Affecting this home environment consideration to a great extent, however, is the fact that Taylor is still only five (5) years of age and can, in the court's opinion, quickly adapt to a new and different living environment.

f. The Court has already alluded to the mental, and perhaps physical, health of the parties with respect to their respective abilities to serve the best interests of Taylor. Unfortunately, they have to date jointly provided for Taylor a somewhat dysfunctional family that has become even more dysfunctional since their final separation on or about July 11, 1992.... The Court ... seconds the evaluator's recommendation for post-divorce counseling for both. Regardless of who the custodial parent is, Taylor will still be in the middle. A continuation of his parents' relationship since their final separation will undoubtedly have an adverse effect on his; in all likelihood, it already has. A recognition and appreciation of that unavoidable circumstance is needed on the part of both parents. Only then will they be able to remedy it with Taylor's best interests becoming their primary, and not secondary, consideration....

6. That, given all of the foregoing, the Court finds that the best interest of Taylor dictate that his care and custody be with the wife. She has provided more direct parenting of Taylor to date and, as a result, offers to Taylor greater stability and security in his living and educational environments in the immediate future. While the Court again admits that such finding is contrary to the briefly-stated conclusion of the evaluator, the Court re-emphasizes that it is the product of review and consideration of all evidence of probative value presented throughout four (4) days of Final Hearing in this cause and the Court's observations and assignments of credibility based on the demeanor of various witnesses while testifying. The evaluator herself was unfortunately not called as a witness and thus her observations, test results, findings and conclusions were not subject to cross examination.

R. at 195–206. Clearly, each of the trial court's findings regarding Taylor's custody correspond with the required statutory factors. In addition, each of the court's findings are supported by evidence in the record. We

acknowledge that the testimony of Craig and Tammy is antithetical, and that for every finding which is supported by evidence in the record, there is evidence to the contrary. However, we can not and will not reverse the trial court on the basis of conflicting evidence. *Julien, supra.* The trial court did not abuse its discretion in awarding sole custody of Taylor to Tammy.

## II. *Antenuptial Agreement*

Craig argues that the trial court erred in finding the parties' antenuptial agreement to be invalid and unenforceable. We agree.

Antenuptial agreements are legal contracts by which parties entering into a marriage relationship attempt to settle the interest of each party in the property of the other during the course of the marriage and upon its termination by death or other means. *In Re Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 693. Antenuptial agreements are favored by the law as " 'promoting domestic happiness and adjusting property questions which would otherwise often be the source of fruitful litigation.' " *Boren,* at 693 (quoting *Buffington v. Buffington* (1898), 151 Ind. 200, 51 N.E. 328, 329).

Here, the trial court found that the parties' antenuptial agreement was invalid and unenforceable because Craig did not disclose his assets and their value to Tammy before she signed the agreement. According to the trial court, parties to an antenuptial agreement are required to disclose the value of their assets to one another prior to executing the agreement. In support of its conclusion, the trial court relied on *Selke v. Selke* (1991), Ind.App., 569 N.E.2d 724, wherein we held that the parties to a property settlement agreement have a duty to fully disclose the value of their marital assets, and failure to do so is constructive fraud.[8] *Id.* at 726.

However, *Selke* was vacated by our supreme court one year before the trial court in this case issued its decision. In *Selke v. Selke* (1992), Ind., 600 N.E.2d 100, our supreme court found that the parties to a property settlement agreement do not have an "express ... duty of mandatory disclosure."

*Id.* at 102. In addition, our supreme court stated as follows:

> We observe that even with respect to antenuptial agreements, presumably entered into when the parties' relationship is likely to be one of trust and reliance, in contrast to the potential and actual adversity which accompanies marriage dissolutions, there is no absolute and mandatory duty imposed upon the parties to disclose information regarding possessions.

*Id.* See also, *Rose v. Rose* (1988), Ind.App., 526 N.E.2d 231, *trans. denied* (no duty to disclose value); *Matter of Estate of Palamara* (1987), Ind.App., 513 N.E.2d 1223 (no duty to disclose value); *Johnston v. Johnston* (1962), 134 Ind.App. 351, 184 N.E.2d 651 (no duty to disclose nature, extent and value).

We further note that our supreme court has stated as follows:

> This court has had several occasions to rule upon the validity of antenuptial agreements and has consistently held that such agreements, so long as they are entered into freely and without fraud, duress or misrepresentation and are not, under the particular circumstances of the case, unconscionable, are valid and binding. *Mallow v. Eastes,* (1913) 179 Ind. 267, 274, 100 N.E. 836, 839; *Kennedy v. Kennedy,* (1898) 150 Ind. 636, 643, 50 N.E. 756, 758; *McNutt v. McNutt,* (1888) 116 Ind. 545, 551–552, 19 N.E. 115, 117. In *Mallow,* we stated:

> > "Our courts have uniformly upheld antenuptial contracts where fairly entered into, even though the effect be to leave the surviving wife very little, based upon the motives of the marriage not being mercenary, but of the highest consideration in itself, and holding under such contracts, that the considerations fixed by the parties will be sufficient, even though the provisions for the contemplated wife be much less than the statutory right of widows, or even give her no property interest."

*Mallow v. Eastes,* 179 Ind. at 274–275, 100 N.E. at 839. *Boren,* 475 N.E.2d at 693.

---

8. The trial court analogized property settlement agreements to antenuptial agreements.

■ Here, Tammy did not allege that there was fraud, duress or misrepresentation surrounding the execution of the antenuptial agreement, and there is no such evidence in the record. Further, Tammy did not allege that the agreement was unconscionable, and we find no evidence of unconscionability in the record. Accordingly, the trial court erred in finding the agreement to be invalid and unenforceable.

We affirm the child custody determination, reverse the trial court's finding that the antenuptial agreement was invalid and unenforceable, and remand for a redistribution of property consistent with this opinion.

FRIEDLANDER, J., concurs.

RILEY, J., concurs in part and dissents in part with separate opinion.

RILEY, Judge, concurring in part and dissenting in part.

I concur with the majority opinion that affirms the trial court's determination of child custody. I dissent from the majority opinion that finds the antenuptial agreement is valid and enforceable.

Our standard of review in this case is clearly a strict standard of review:

> A reviewing court must determine whether evidence presented below can serve as a rational basis for the trial court's decision. However, the reviewing court will neither reweigh the evidence nor reassess the credibility of witnesses in making this determination. In applying this strict standard of review, the court of appeals will consider only the evidence most favorable to the trial court's disposition and reasonable inferences which can be drawn therefrom. To obtain reversal, it must be shown that the trial court abused its discretion in arriving at its decision. *Rose v. Rose* (1988), Ind.App., 526 N.E.2d 231, 234. (citations omitted).

The trial court listened to testimony during the course of four days. All of the evidence pertaining to the antenuptial agreement was before the trial court to be weighed and assessed before the trial court made its decision. The trial court deter-

mined that the agreement was not valid and not enforceable by listening to all of the evidence, considering all of the exhibits submitted to the court and observing the demeanor of the witnesses. In the face of conflicting evidence, it is improper for an appellate court to reweigh the evidence presented to the trial court. *Parr v. Parr* (1994), Ind., 644 N.E.2d 548, 550, (overturning our decision in a suit to determine whether an antenuptial agreement was valid on the basis that the decision was arrived at by reweighing the evidence).

I would affirm the judgment of the trial court.