William O. IRVINE, Appellant–Respondent,

v.

Sharon L. IRVINE, Appellee–Petitioner.

No. 49A04–9602–CV–72.

Court of Appeals of Indiana.

Aug. 25, 1997.

David B. Hughes, Hughes & Salee, Indianapolis, for Appellant–Respondent.

Franklin I. Miroff, Nancy L. Cross, Miroff, Cross & Klineman, Indianapolis, for Appellee–Petitioner.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

William Irvine appeals the trial court's distribution of marital property to Sharon Irvine. We reverse and remand for proceedings consistent with this opinion.

### ISSUE

Whether the trial court erred in failing to consider the tax consequences for pre-retirement liquidation of William's pension plan.

### FACTS [1]

William and Sharon Irvine were married on July 5, 1975. William was a 39 year-old orthopaedic surgeon with five children from a previous marriage, and Sharon was a 37 year-old travel agent with two children from a previous marriage. William owned substantial property in his name, including: 1) fifty shares of the common stock of Orthopedics–Indianapolis, Inc.; 2) a residence in Indianapolis; 3) a cabin and approximately 40 acres of real estate in Brown County; 4) a partnership interest in a Hamilton County farm; 5) a cottage in Florida; 6) a one-hundred percent vested interest in the Orthopedics–Indianapolis, Inc. profit sharing plan; 7) several vehicles; and 8) miscellaneous personal property. Sharon owned an automobile and miscellaneous personal property. Ten days before their marriage, William and Sharon executed an antenuptial agreement ("agreement").

On March 11, 1992, Sharon filed a petition for dissolution of marriage. Two months later, William filed a counterclaim for dissolution wherein he asked the trial court to distribute the parties' property interests pursuant to the agreement. The trial court held a hearing on the petitions wherein Sharon argued that the agreement was inapplicable in a marriage dissolution, and William contended that it applied. On June 11, 1993, the trial court issued findings of fact, conclusions of law and a decree of dissolution of marriage wherein the court found that the agreement did not apply in a marriage dissolution, and distributed the parties' property accordingly. William appealed and, in a memorandum decision, this court found that the trial court erred in distributing the parties' marital property. ("*Irvine I*").[2] Specifically, we reversed and remanded the case with instructions to the trial court to distribute the marital property to the parties pursuant to the terms of the agreement, which we found did apply in a marriage dissolution.

The trial court held a remand hearing on October 10, 1995. At the hearing, the trial court heard argument but declined to receive any evidence from William concerning the tax consequences to him of the all-cash award which Sharon requested from the marital pot remaining after our decision in *Irvine I*. William made an offer to prove. On November 3, 1995, the trial court issued an order which provides in pertinent part as follows:

1. The assets of the parties subject [to] a division under the terms of the Antenuptial Agreement and their respective values, are as follows:

| | |
|---|---|
| Partnership interest in Methodist Associates, Ltd. | $ 44,900.00 |
| Real Estate located at R.R. 4, Box 262D, Hoover Road, Nashville, IN, consisting of 65.7 acres | $ 73,000.00 |
| Real Estate located at R.R. 4, Box 262D, Hoover Road, Nashville, IN, consisting of 145 acres together with improvements thereon | $ 105,968.18 |
| 5 acres more or less of improved real estate located on Indian Mountain, Colorado | $ 11,870.00 |
| Net Cash Surrender Value of Life Insurance | $ 38,790.00 |
| Federal and State Tax Refunds | $ 12,891.79 |
| Prudential Account No.... | $ 27,203.65 |
| INB Account No ... | $ 1,845.60 |
| INB Account No ... | $ 69,130.05 |
| Motorcycles | $ 6,995.00 |
| Toyota Van | $ 16,000.00 |
| 1980 Saab | $ 15,750.00 |
| 1983 Silverado | $ 2,800.00 |
| 1988 Mazda | $ 2,400.00 |
| Farm Equipment | $ 12,110.00 |

---

1. We heard oral argument on July 8, 1997, in Indianapolis.

2. *Irvine v. Irvine*, 640 N.E.2d 450 (Ind.Ct.App., 1994), *trans. denied*.

| | | |
|---|---|---|
| 1966 Riviera Cruiser Pontoon Boat with 1980 Mercury 25 horsepower engine | $ | 1,125.00 |
| Guns | $ | 2,500.00 |
| Household goods in cabin | $ | 655.00 |
| Household goods in Husband's possession | $ | 11,245.00 |
| Household goods in Wife's possession | $ | 500.00 |
| Pension Plan (3/1/92) | $ | 614,348.12 [3] |
| TOTAL | | $1,072,043.00 |

2. The "marital [e]state" as defined above, should be reduced by the parties' 1992 tax liability of Forty–Five Thousand Dollars ($45,000), resulting in a divisible estate of One Million Twenty Seven Thousand and Forty–Three Dollars ($1,027,043.00).

3. The parties agreed in Court that wife should receive 50% of the value of the "marital estate" as defined above, subject to only a 30% interest in the Colorado property, which results in wife's total property distribution of Five Hundred and Eleven Thousand, One Hundred and Forty–Seven Dollars and Fifty Cents ($511,147.50). The Court finds that, given the relative financial circumstances of the parties and relative contributions during the marriage, that it is fair and equitable for wife to receive the maximum distribution of 50% permitted by the Antenuptial Agreement.

4. The parties agreed in the documents submitted to the Court that wife should be credited with having received Household goods valued at $935.00 and a Toyota Van valued at $16,000.00 as part of her distribution.

After crediting William for the approximately $150,000.00 in cash payments advanced to Sharon during the three-year pendency of the proceedings, the trial court ordered William to 1) immediately pay Sharon $392,385.00 in cash, and 2) distribute $55,827.10 to her from his pension plan via a Qualified Domestic Relations Order.

## DECISION

William claims that the trial court erred in failing to consider the tax consequences for pre-retirement liquidation of his pension plan. We agree.

We addressed a similar argument in *Qazi v. Qazi*, 546 N.E.2d 866 (Ind.Ct.App.1989), *trans. denied*, wherein the trial court awarded Husband two pension plans, and ordered him to make periodic cash payments to Wife. On appeal, Husband argued that the trial court erred in failing to consider the potential tax consequences for pre-retirement liquidation of his pension plans. We disagreed and stated as follows:

The tax consequences associated with possible liquidation of [Husband's] pension plans are speculative in nature and were properly disregarded. It has been held that where a trial court's distribution does not require liquidation of pension or retirement plans, any potential tax consequences of early liquidation are speculative in nature and should not be considered in making a distribution. In this case, the trial court clearly did not require liquidation of the plans and, in fact, carefully fashioned a periodic payment schedule to avoid just such an occurrence.

[Husband's] arguments are reminiscent of those made and rejected in [*Wright v. Wright*, 471 N.E.2d 1240, 1244–45 (Ind.Ct. App.1984), *reh'g denied, trans. denied*, wherein we stated as follows]:

Husband goes on to argue that it was error for the trial court to distribute to him his pension and profit sharing plan without taking into consideration the tax consequences thereof. Finding No. 34 states that the court specifically considered the potential tax liability and determined that it was 'speculative' and thus incapable of valuation.

Here, the husband was ordered to pay wife $159,373.00 to be paid in installments of $39,373.00 the first year and $24,000.00 per year in the five succeeding years. The evidence before the court was that the parties had a net marital estate in excess of $970,000, over $300,000 of which was in stocks and bonds which were awarded to the hus-

---

3. As of March 1; 1992, William's pension plan was valued at $614,348.12. On remand, the trial court should award Sharon the appropriate percentage of any increase in value in the pension plan.

band in the final decree. Husband received over $700,000 in assets pursuant to the decree and the court found him to have an annual income ranging from $135,000 to $195,000 per year.

While husband may or may not have 'cashed in' his pension plan, the court did not require him to do so by the terms of the decree. In addition, husband was clearly awarded sufficient assets with which to raise the first installment without invading his pension. Whether husband decides to cash in his pension and incur tax liability is purely a matter of choice. Since it is entirely reasonable that husband may not do so, the trial court was correct in considering the tax liability 'too speculative' for valuation.

*Id.* at 871.

In *Qazi,* we noted that Husband was ordered to pay $525,000 to Wife over a ten-year period for which the court designed a payment schedule with annually increasing payments. We further noted that Husband received pension plans valued at $762,500, as well as numerous other assets including a $325,000 residence, a $178,400 office building, $100,368 in accounts receivable, a $20,000 interest in Signature Inn, and miscellaneous items valued at $120,000. Further, Husband's annual income was $424,783 in 1985, $590,000 in 1986, and $222,000 in 1987. We therefore found a number of options available to Husband to enable him to meet his court-ordered payment obligations. Specifically, we found and concluded as follows:

These options could include, but are not limited to, liquidation of his pension plans. Clearly the terms of the payment schedule, considered in light of the assets he received, do not dictate this result. [Husband] may choose to meet his legal obligation from his earnings, as he would any other debt, but again he is not required to do so by the terms of the trial court order. The point is that [Husband] was awarded sufficient assets to meet the payment schedule which the trial court fashioned. The *method* of payment is for [Husband] to determine. There is absolutely no evidence that he is liquidating his pension plans, must liquidate them, or intends to

liquidate them. Therefore, the tax consequences are purely speculative and must be disregarded.

*Id.* at 872.

However, the facts before us are distinguishable from those in *Qazi* and *Wright.* First, unlike the parties in *Qazi* and *Wright,* William and Sharon signed an antenuptial agreement which, by its terms, protects William's personal assets by excluding them from the marital estate. Antenuptial agreements are legal contracts by which parties entering into a marriage relationship attempt to settle the interest of each party in the property of the other during the course of the marriage and upon its termination by death or other means. *In Re Marriage of Boren,* 475 N.E.2d 690, 693 (Ind.1985). Antenuptial agreements are favored by the law as " 'promoting domestic happiness and adjusting property questions which would otherwise often be the source of fruitful litigation.' " *Boren,* at 693 (quoting *Buffington v. Buffington,* 151 Ind. 200, 51 N.E. 328, 329 (1898)). Because they are contracts, antenuptial agreements are to be construed according to the general principles applicable to the construction of ordinary contract provisions. *Harlan v. Harlan,* 544 N.E.2d 553, 556–57 (Ind.Ct.App.1989), *aff'd,* 560 N.E.2d 1246 (Ind.1990). Further, the interpretation of a contract is a question of law for the court. *Bressler v. Bressler,* 601 N.E.2d 392, 395 (Ind.Ct.App.1992).

In *Irvine I,* this court interpreted provision 14 of the agreement as an expression of the parties' "intent that the Agreement protect their interests in their respective individual property in the event of death or dissolution of marriage." (R. 26). This interpretation of the agreement is binding on us. *See, Estate of Martin v. Consolidated Rail Corp.,* 667 N.E.2d 219, 220 (Ind.Ct. App.1996). An order which effectively requires William to dispose of his personal assets would violate both William's interests in his individual property and the antenuptial agreement. Therefore, the antenuptial agreement dictates that we confine our review of the assets available to William for compliance with the trial court's property

distribution order to the previously described marital assets.

Second, unlike the courts in *Qazi* and *Wright,* the trial court herein ordered William to *immediately* pay Sharon $392,385.00 in cash. Our review of the assets of the parties subject to a division under the terms of the agreement reveals approximately $150,000 in cash [4]—leaving almost a $250,000 difference. In order for him to immediately obtain $250,000 in cash, William would have to liquidate his $614,348.12 pension plan. Unlike *Qazi* and *Wright,* there are not sufficient assets in the marital pot to allow William to meet the trial court's plan of immediate distribution without liquidating his pension plan. Rather, the terms of the trial court's distribution plan necessarily require William to liquidate the plan. Therefore, the tax consequences of early liquidation were not speculative and should have been considered. *See also, Harlan v. Harlan,* 544 N.E.2d 553 (Ind.Ct.App.1989), *aff'd,* 560 N.E.2d 1246 (Ind.1990)("[T]ax consequences necessarily arising from the plan of distribution are to be taken into account...."); *In Re Marriage of Mulvihill,* 471 N.E.2d 10 (Ind.Ct.App.1984). Based on the facts of this case, the trial court erred in failing to consider the tax consequences for pre-retirement liquidation of William's pension plan.

 Finally, we will address one other issue raised by William that is likely to reappear on remand. William contends that the trial court erred in its 1995 entry when it awarded statutory post-judgment interest from the date of the original 1993 decree. William reasons that our opinion in *Irvine I* reversed the original decree and that there was no judgment upon which interest could have accrued until after the 1995 entry. Sharon counters that *Irvine I* merely instructed the trial court to make mathematical adjustments to the marital estate and to recalculate the distribution accordingly.

To the extent that the final distribution includes an award to Sharon under a Qualified Domestic Relations Order, Sharon would benefit from any appreciation in the value attributable to her share of William's pension

from the date of the original decree, in lieu of interest. However, the trial court did not err in awarding Sharon post-judgment interest on that amount of the distribution consisting of cash, with a credit to William for the cash payments made post-decree, and a corresponding reduction in the accrual of interest attributable to those payments. Although the cash distribution will have been adjusted on remand after two appeals, the effective date of the money judgment as finally determined remains the date of the original decree. Unless otherwise provided by statute, interest on judgments for money runs from the date of judgment. *See,* Ind. Code 24–4.6–1–101.

Reversed and remanded for proceedings consistent with this opinion.

BAKER and NAJAM, JJ., concur.

---

4. The $150,000 includes the net cash surrender value of life insurance, federal and state tax refunds, a Prudential account, and two INB accounts.