

FILED

May 28 2019, 5:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Monty K. Woolsey
Carmel, Indiana

Andrew R. Bloch
Carmel, Indiana

ATTORNEY FOR APPELLEE

William O. Harrington
Danville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Shaun Perrill,

*Appellant-Petitioner,*

v.

Brandy Perrill,

*Appellee-Respondent.*

May 28, 2019

Court of Appeals Case No.
18A-DN-1616

Appeal from the Hendricks
Superior Court

The Honorable Robert W. Freese,
Judge

Trial Court Cause No.
32D01-1709-DN-552

**Tavitas, Judge.**

## Case Summary

[1]     Shaun Perrill ("Husband") filed this interlocutory appeal after the trial court concluded there was no enforceable premarital agreement (the "Agreement") between Husband and Brandy Perrill ("Wife"). We reverse and remand.

## Issues

Husband raises several issues on appeal, which we consolidate and restate as:

  I.   Whether the trial court erred in concluding there was no meeting of the minds between the parties to form an enforceable contract.

  II.   Whether the trial court erred in failing to admit testimony regarding Wife's excluded property.

  III.   Whether the trial court erred in concluding the Agreement was unconscionable.

## Facts

Husband and Wife met in 2000 when they were both students at Purdue University. Wife graduated in 2001, and Husband graduated in 2002. Husband and Wife began living together in 2002. The couple eventually moved to Hendricks County in 2003.

Husband began working at Matrix Label Systems, one of his family's businesses. Wife began working at Hendricks College Network and is now the executive director. At some point early in the couple's relationship, Husband mentioned to Wife that he would be interested in having Wife sign a premarital agreement if the couple were to marry. Husband's family had several family businesses that Husband sought to protect. The couple were engaged to be married in 2005, and they married in 2008.

[5] Shortly before Husband's and Wife's wedding day in October 2008, Husband presented Wife with the Agreement. Wife asked an attorney to review the Agreement for her. Wife testified that she only saw one version of the Agreement, which was the version that she signed.[1] Wife claims she did not make any changes to the Agreement before she signed. Wife also testified that, as part of the Agreement, she was asked to provide a list of property that would be identified as her excluded property in the event the couple divorced.

[6] The Agreement consisted of three main parts. The first section is the main portion of the Agreement, which covers nine pages, and includes the signature of both parties and the notary. In this portion of the Agreement, Husband and Wife agreed that each would:

> retain the value of certain of [his or her] own individual assets and property that [he or she] now owns or later receives as a gift or inheritance, including any increase in the value of such property, . . . the same as though [he or she] were not married and free from any control, interest, claim or right whatsoever of the other Party whether growing out of the marital relationship or by reason of death.

Appellant's App. Vol. II p. 151. This section defines Husband's excluded property as follows:

---

[1] There were several previous drafts of the Agreement; however, Wife claims she only saw the final version of the Agreement. The parties tendered, as a joint factual stipulation, an affidavit by attorney Ryan Leach, who was the drafter of the Agreement and is also Husband's parents' business attorney. The trial court accepted the joint factual stipulation on March 22, 2018. Attorney Leach did not receive a copy of the executed Agreement until November 7, 2017.

In the case of Husband, Excluded Property shall mean and include all of the common stock or ownership units or other such ownership interests in and of Compatible Technologies, LLC owned by Husband and shall also mean and include the membership or ownership interests of Moon Limited Partnership, now owned by Husband or received in the future by Husband, and any income, dividends, increase or decrease in value, or proceeds thereof, including any increase in the value of such shares, membership, or other ownership interests, or arising under the terms of Husband's employment with compatible Technologies, LLC or Moon Limited Partnership as now in effect or as hereafter agreed, provided, however, that Husband's salary from Compatible Technologies, LLC shall not constitute Excluded Property. Husband's Excluded Property shall also include any property acquired with Excluded Property. Husband's Excluded Property shall also include any gifts or inheritances later received from his family.

*Id.* at 152-53. The next part of the Agreement is "Exhibit A," which is defined in the main Agreement as Wife's "financial and asset information" as well as Wife's "excluded property." *Id.* at 152. Finally, the third part of the Agreement is "Exhibit B," which is defined as Husband's "financial and asset information." *Id.*

[7] Wife asked Rebecca Cotney to serve as a notary for purposes of executing the Agreement. Cotney's signature notarizing the Agreement indicates that both Exhibit A and Exhibit B were included with the Agreement. Husband testified that, after he and Wife signed the Agreement, he placed the Agreement in a fire-proof filing cabinet.

[8] After Husband filed a petition to dissolve the marriage on September 13, 2017, Wife filed a motion to determine the enforceability of the couple's Agreement on March 7, 2018. Wife testified to the foregoing facts and her uncertainty regarding the Agreement she actually signed. Wife does not recall if she received a copy of the Agreement at its execution. The next time Wife recalls seeing the Agreement after its execution was in 2017 when this matter began. Wife noticed, however, that when she received a copy of the Agreement in 2017, it did not appear to be the same Agreement she signed because her Exhibit A was not attached. Instead, there was another document titled "Exhibit A" which appeared to list items belonging to Husband, and no Exhibit B was attached. ("Version 1").

[9] On November 1, 2017, Wife sent Husband a request for production of documents, requesting that Husband produce a complete copy of the executed Agreement. In response to the requests, Husband produced another version of the Agreement, which did not include a page entitled Exhibit A. In this version, Husband's excluded items list was attached as Exhibit B ("Version 2"). This Exhibit B was slightly different than the exhibit produced in Version 1.

[10] Wife testified that she prepared Exhibit A and gave it to Husband; however, at the hearing, Wife did not recall the items she included on Exhibit A. On the other hand, Husband stated that he "[did] not recall [Wife] giving [him] [E]xhibit A." Tr. Vol. III p. 56. Husband stated that he was aware when the

parties signed the Agreement that Exhibit A was not attached.[2] Husband did not believe that Wife prepared an Exhibit A because, according to Husband, Wife did not own any property of value at the time.

[11] After an evidentiary hearing on the issue, the trial court entered its findings of fact and conclusions of law on May 3, 2018, and concluded, in relevant part,

> 31. Sometime on or after October 16, 2008, Wife prepared an Exhibit "A" list of what Wife wanted to be her "Excluded Property" under the Antenuptial Agreement . . . . In addition, Wife delivered Wife's Exhibit 'A' List of Excluded Property to Husband.
>
> * * * * *
>
> 36. Wife understood and intended that she executed the Executed Antenuptial Agreement with Wife's Exhibit 'A' List of Excluded Property attached.
>
> * * * * *
>
> 55. Wife's Exhibit 'A' List of Excluded Property is not attached to either the First version of executed Antenuptial Agreement or the Second Version of Antenuptial Agreement.

---

[2] Husband gave somewhat conflicting testimony at his deposition, testifying at one point that Exhibit A was not attached to the Agreement because "[Wife] did not have any excluded property," but later testifying that Husband "cannot recall if there was an exhibit A at [the time the Agreement was executed]." Tr. Vol. III pp. 61-62.

\* \* \* \* \*

60. The First Nine Pages clearly demonstrate that Wife's Exhibit 'A' List of Excluded Property was attached to the Executed Antenuptial Agreement when it was executed. Wife contends that Wife's Exhibit 'A' List of Excluded Property (a) was intended to be attached to the Executed Antenuptial Agreement and (b) was, in fact, attached to the Executed Antenuptial Agreement when it was executed. During the Second Hearing, Husband testified that Wife's Exhibit 'A' List of Excluded Property was not attached to the Executed Antenuptial Agreement when it was executed. On the basis of this evidence, it is evident that there was no meeting of the minds between Wife and Husband. Therefore, if Husband's testimony during the Second Hearing is taken at face value, no binding Antenuptial Agreement was ever formed by Wife and Husband.

\* \* \* \* \*

63. As noted above, in *Irvine v. Irvine*, 685 N.E.2d 67 (Ind. Ct. App. 1997), the Court of Appeals of Indiana held that, "[a]ntenuptial agreements are legal contracts by which parties entering into a marriage relationship attempt to settle the interest of each party in the property of the other during the course of the marriage and upon its termination by death or other means." *Id.* at 71. Thus, the precise and essential purpose of an antenuptial agreement is to settle the rights of the parties to their property in contemplation of marriage. In this case, there was no meeting of the minds between Husband and Wife because an essential term of the Antenuptial Agreement – Wife's Excluded Property – is uncertain. Therefore, the intention of Wife and Husband when they entered into the Antenuptial Agreement is uncertain and the Antenuptial Agreement (both versions) cannot be specifically enforced.

* * * * *

70. Neither the First Version of Executed Antenuptial Agreement nor the Second Version of Executed Antenuptial Agreement is enforceable as a matter of law.

71. There is no enforceable premarital agreement between Wife and Husband in this case.

Appellant's App. Vol. II pp. 16, 21, 23-26 (emphasis supplied).  Husband now appeals.

## Analysis

[12]    Husband appeals from the trial court's findings of fact and conclusions of law. Accordingly,

> [W]e apply a two-tiered standard of review for clear error; that is, first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment.  We do not reweigh the evidence but consider the evidence favorable to the judgment.
>
> Findings of fact are clearly erroneous when the record contains no facts to support them, and a judgment is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies an incorrect legal standard. Although we review findings under the clearly erroneous standard, we review conclusions of law de novo.

*Carmer v. Carmer*, 45 N.E.3d 512, 516-17 (Ind. Ct. App. 2015) (citations omitted).

## I.    Enforceability of Agreement

We begin with Husband's argument that the parties' intent was clear, and, accordingly, the trial court erred in finding there was no meeting of the minds between the parties, and thus, no contract. This conclusion of law is reviewed de novo by our Court. *See Carmer,* 45 N.E.3d at 517.

Generally, courts favor premarital agreements, and our Supreme Court "has consistently held that [antenuptial] agreements, so long as they are entered into freely and without fraud, duress, or misrepresentation and are not, under the particular circumstances of the case, unconscionable, are valid and binding." *In re Marriage of Boren,* 475 N.E.2d 690, 693 (Ind. 1985). "'Antenuptial agreements are favored by the law and will be liberally construed to effect, so far as possible, the parties' intentions.'" *Boetsma v. Boetsma,* 768 N.E.2d 1016, 1024 (Ind. Ct. App. 2002) (quoting *Beatty v. Beatty,* 555 N.E.2d 184, 188) (Ind. Ct. App. 1990)), *trans. denied.* "Standard principles regarding contract formation and interpretation apply to premarital agreements." *Fetters v. Fetters,* 26 N.E.3d 1016, 1020 (Ind. Ct. App. 2015), *trans. denied.* "The party urging the validity of a contract bears the onus of proving its existence." *Ochoa v. Ford,* 641 N.E.2d 1042, 1044 (Ind. Ct. App. 1994).

A premarital agreement between parties contemplating marriage "must be in writing and signed by both parties." Ind. Code § 31-11-3-4. "The agreement is enforceable without consideration." *Id.* "It is fundamental that a contract is formed by the exchange of an offer and acceptance between contracting parties." *Ochoa,* 641 N.E.2d at 1044 (citations omitted). "The parties to a

contract have the right to define their mutual rights and obligations, and a court may not make a new contract for the parties or supply missing terms under the guise of construing a contract." *Id.*

[16] "The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction." *Jermas v. Gumz,* 53 N.E.3d 434, 445 (Ind. Ct. App. 2016), *trans. denied.* "There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract." *Id.* "Only 'reasonable' certainty is necessary; 'absolute certainty in all terms is not required.'" *Id.* (citing *Allen v. Clarian Health Partners, Inc.,* 980 N.E.2d 306, 309 (Ind. 2012)). Instead, "[o]nly essential terms need to be included to render a contract enforceable." *Id.* "An agreement required to be in writing must completely contain the essential terms without resort to parol evidence in order to be enforceable." *Schuler v. Graf,* 862 N.E.2d 708, 713 (Ind. Ct. App. 2007), *trans. denied.*

[17] "The court must read all of the contractual provisions as a whole to accept an interpretation that harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered the contract." *Schmidt v. Schmidt,* 812 N.E.2d 1074, 1080 (Ind. Ct. App. 2004) (citations omitted). "If the language of the agreement is unambiguous, the intent of the parties must be determined from the four corners of the document." *Id.* (citing *Bressler v. Bressler,* 601 N.E.2d 392, 395 (Ind. Ct. App. 1992)). "The terms of a

contract are ambiguous only when reasonably intelligent persons would honestly differ as to the meaning of those terms." *Id.*

[18] At the outset, it appears that the question of the parties' intent and whether there was a meeting of the minds is focused squarely on the attachment of Exhibit A. The trial court first found that there was no "meeting of the minds" between the parties because Wife claims that she attached Exhibit A to the Agreement, whereas Husband claims that Wife did not. The trial court implies that Exhibit A is essential and, accordingly, concludes that it could not enforce the agreement without the meeting of the minds on this essential term.

[19] Turning to the four corners of the document, the Agreement set forth the purpose of the Agreement, stating,

> WHEREAS, it is the desire and intention of Wife and Husband that Husband will retain the value of certain of his own individual assets and property that he now owns or later receives as a gift or inheritance, including any increase in the value of such property or, the same as though he were not married and free from any control, interest, claim or right whatsoever of the other Party whether growing out of the marital relationship or by reason of death; and

> WHEREAS, it is the desire and intention of Wife to release, relinquish, waive and discharge any and all claim, right, title, interest, expectancy or otherwise, or in, or to certain of the property or estate of Husband as set forth herein (including contingent rights or claims) whether arising out of the marital relationship of Wife and Husband or as a result of the death of the other Party, or otherwise; and

WHEREAS, it is the desire and intention of Wife and Husband that Wife will retain the value of certain of her own individual assets and property that she now owns or later receives as a gift or inheritance, including any increase in the value of such property or, the same as though she were not married and free from any control, interest, claim or right whatsoever of the other Party whether growing out of the marital relationship or by reason of death; and

WHEREAS, it is the desire and intention of Husband to release, relinquish, waive and discharge any and all claim, right, title, interest, expectancy or otherwise, or in, or to certain of the property or estate of Wife as set forth herein (including contingent rights of claims) whether arising out of the marital relationship of Wife and Husband or as a result of the death of the other Party, or otherwise; . . .

Appellant's App. Vol. II p. 151.

[20] Pursuant to paragraph 4 of the Agreement, excluded property for Wife would include "all property shown in Exhibit A, including any income, dividends, increase or decrease in value, or proceeds with respect to such property, and any gifts or inheritances later received from her family," whereas Husband's excluded property was defined separately in the first nine pages of the Agreement. *Id.* at 152. Husband's excluded property is defined as:

In the case of Husband, Excluded Property shall mean and include all of the common stock or ownership units or other such ownership interests in and of Compatible Technologies, LLC owned by Husband and shall also mean and include the membership or ownership interests of Moon Limited Partnership, now owned by Husband or received in the future by Husband, and any income, dividends, increase or decrease in

value, or proceeds thereof, including any increase in the value of such shares, membership, or other ownership interests, or arising under the terms of Husband's employment with compatible Technologies, LLC or Moon Limited Partnership as now in effect or as hereafter agreed, provided, however, that Husband's salary from Compatible Technologies, LLC shall not constitute Excluded Property. Husband's Excluded Property shall also include any property acquired with Excluded Property. Husband's Excluded Property shall also include any gifts or inheritances later received from his family.

*Id.* at 152-53.

[21] The Agreement also set forth that "the value of Wife's Excluded Property, as defined and disclosed in Exhibit A, shall be set off to Wife free of and without any claim by Husband and Husband's Excluded Property, as defined in this Agreement, shall be set off to Husband free of and without any claim by Wife." *Id.* at 153. As to the remaining marital property, the Agreement states that it "shall be equally divided between Wife and Husband, after distribution of Wife's Excluded Property and Husband's Excluded Property has been made."[3] *Id.* In other words, the language of the Agreement anticipated that property would be set aside to each party pursuant to the Agreement's definition of

---

[3] Relatedly, the Agreement also contemplates, that

Wife and Husband further acknowledge and understand that they may pool certain of their financial resources together in a joint effort to acquire various and, at present, undetermined assets such as real estate or financial investments. In the event of Wife and Husband's separation or marriage dissolution, each understands and agrees that all such acquired property shall be forthwith distributed amicably between them, or in the event Wife and Husband cannot agree, liquidated with the net proceeds derived from the liquidation to be evenly distributed between them.

Appellant's App. Vol. II p. 154.

excluded property. Exhibit A would have only identified property Wife owned prior to the marriage. The issue then becomes whether the contents of Exhibit A, or Wife's excluded property, contain essential terms.

[22] While we agree that Wife's Exhibit A would give more context to identify Wife's premarital property, the identification of the property itself is not essential. In *Hunsberger v. Hunsberger,* 653 N.E.2d 118, 125 (Ind. Ct. App. 1995), a panel of this court reversed the trial court's conclusion that the antenuptial agreement between the parties was invalid and unenforceable. Specifically, the trial court found that the antenuptial agreement was invalid and unenforceable "because [the husband] did not disclose his assets and their value to [the wife] before she signed the agreement." *Id.* There, aside from the trial court's error in relying on a vacated case, this court found that the trial court erred because,

> "even with respect to antenuptial agreements, presumably entered into when the parties' relationship is likely to be one of trust and reliance, in contrast to the potential and actual adversity which accompanies marriage dissolutions, there is no absolute and mandatory duty imposed upon the parties to disclose information regarding possessions."

*Hunsberger v. Hunsberger*, 653 N.E.2d 118, 125 (Ind. Ct. App. 1995) (quoting *Selke v. Selke*, 600 N.E.2d 100, 102 (Ind. 1992)).

[23] Here, the trial court ultimately concluded that Wife did attach Exhibit A when the parties executed the Agreement. Exhibit A, as evidenced by the parties' intent in the main Agreement, was intended to identify Wife's excluded property in the event of dissolution or death. The actual list of excluded

property can be easily recreated and was not an essential term relating to the intent of the parties. This is especially true when the intent of the main portion of the Agreement was clear. The trial court expressly found that the "first nine (9) pages of the First Version of Executed Antenuptial Agreement and the first nine (9) pages of the Second Version of Executed Antenuptial agreement are identical." Appellant's App. Vol. II p. 19. This is important because, as a reviewing Court, we do not reweigh the evidence. Instead, we merely review the Agreement to determine whether the parties' intent is clear.

[24] The first portion also squarely states, that, "the inadvertent omission of any property shall not affect the validity, effect, or enforceability of this Agreement." *Id.* at 155. Further, the Agreement also has a partial invalidity clause that states,

> [s]hould any part or segment of this Agreement be declared invalid by a court of competent jurisdiction, the declaration shall not affect the validity of the remaining portions of this Agreement, all of which shall continue in full force and effect as though this Agreement had been executed with the invalid portion deleted.

*Id*. The Agreement also contains a severability clause that states,

> [s]hould any provision of this Agreement be held invalid or unenforceable by any court of competent jurisdiction, all other provisions shall nonetheless continue in full force and effect, to the extent that the remaining provisions are fair, just and equitable.

*Id.* at 156. While we recognize that the trial court did not find that a portion or provision of the Agreement was invalid, we believe this provision further evidences the parties' intent that the property each owned before marriage would be excluded. The intent of the parties—that each would retain his or her excluded property—was clear; the specificity of Wife's excluded property was not needed to find the intent between the parties.

[25] Relatedly, we note that Exhibit B does not define Husband's excluded property, but merely lists his assets and financial information at the time he signed the Agreement. Husband's excluded property is defined in the main portion of the Agreement. Husband's list had minor changes between Version 1 and Version 2. While this is concerning, these changes do not impact an essential term of the Agreement.

[26] Ultimately, the terms of the contract do not change with time, whereas the parties' actual property is fluid and everchanging. The Agreement ultimately contemplates the potential for change in defining excluded property, using terms such as "any gifts or inheritance later received. . .," and "now owned by Husband or received in the future by Husband." Appellant's App. Vol. II p. 152. In other words, the parties' Agreement already contemplated that each party would be required to later identify property that fit within the definition of excluded property.

[27] All essential contractual elements were present in the Agreement with or without Exhibit A or B. Accordingly, the trial court erred in concluding as a

matter of law that there was no contract between the parties. The mere fact that Exhibit A was missing does not render the entire contract unenforceable. Exhibit A was designed to identify Wife's specific excluded property at the time she signed the Agreement.

## II.     *Parol Evidence*

[28]     Husband next contends that it was error for the trial court to deny admission of parol evidence to prove that Wife did not own any property at the time of the marriage. As we have noted, "An agreement required to be in writing must completely contain the essential terms without resort to parol evidence in order to be enforceable." *Schuler,* 862 N.E.2d at 713. The Agreement does contain the essential elements of a contract. The contents of the missing Exhibit A were not essential terms of this contract as Wife asserts. "The parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of a written contract." *Millner v. Mumby,* 599 N.E.2d 627, 629 (Ind. Ct. App. 1992). "The prohibition against the use of parol evidence is by no means complete; in fact, parol evidence may be considered as long as it has not been offered to vary the terms of the written contract." *Id.* For example, "parol evidence may be admitted to supply an omission in the terms of the contract." *Malo v. Gilman,* 379 N.E.2d 554, 557 (Ind. Ct. App. 1978).

[29]    Here, parol evidence should have been introduced with regard to the items listed on Wife's Exhibit A.[4]  The introduction of evidence with regard to what was included on Wife's Exhibit A would not have contradicted the terms of the agreement, but merely would have provided specific determination of Wife's premarital property at the time the Agreement was executed.  *See Malo,* 379 N.E.2d at 558 (finding that "parol evidence of a maximum cost limitation may be introduced where the contract fails to contain such a limitation").  Similarly here, parol evidence is admissible to determine what property Wife owned prior to the marriage and would have listed in her Exhibit A.  Wife is not denied her excluded property; instead, it is a question of fact as to what property Wife is entitled to as excluded property, which Wife may show using parol evidence. Whether Exhibit A actually existed does not change the terms of the contract. Parol evidence should have been allowed to determine what, if any, property Wife owned prior to the marriage.

---

[4] Importantly, Wife was asked if she could recall what she included in her Exhibit A, to which she responded, "I don't recall what I put on that list."  Tr. Vol. III p. 15.  Ultimately, Wife would have to identify evidence of the property she owned prior to the marriage pursuant to Indiana Code Section 31-15-7-4, which states:

> (a) In an action for dissolution of marriage under IC 31-15-2-2, the court shall divide the property of the parties, whether:
>   (1) owned by either spouse before the marriage;
>   (2) acquired by either spouse in his or her own right:
>         (A) after the marriage; and
>         (B) before final separation of the parties; or
>   (3) acquired by their joint efforts.

### III. Unconscionability

[30] Finally, Husband argues that the Agreement complies with Indiana's Uniform Premarital Agreement Act ("UPAA") pursuant to Indiana Code Chapter 31-11-3, and is, accordingly, not unconscionable. At the beginning, we note that we are not entirely certain that the trial court found the agreement was unconscionable. The trial court's order concludes, "It would be unconscionable for the Court to enforce the Antenuptial Agreement in Husband's sole favor, while denying Wife her express bargain – that Wife's Exhibit 'A' List of Excluded Property would be protected in the event of divorce or death." Appellant's App. Vol. II p. 25. The trial court apparently used the term "unconscionable" to describe the potential result, and not the Agreement itself.

[31] Regardless, we agree with Husband that the Agreement is not unconscionable. Generally, "[a] premarital agreement is not enforceable if a party against whom enforcement is sought proves that: (1) the party did not execute the agreement voluntarily; or (2) the agreement was unconscionable when the agreement was executed." I.C. § 31-11-3-8(a). The court decides whether a premarital agreement is unconscionable as a matter of law. I.C. § 31-11-3-8(c). Our Supreme Court has given context to the unconscionability definition, concluding that an agreement is unconscionable if:

> "there was a gross disparity in bargaining power which led the
> party with the lesser bargaining power to sign a contract
> unwillingly or unaware of its terms and the contract is one that
> no sensible person, not under delusion, duress or distress would

accept. The doctrine of unconscionability necessarily looks to the time of execution."

*Rider v. Rider,* 669 N.E.2d 160, 162 (Ind. 1996) (quoting *Justus v. Justus,* 581 N.E.2d 1265, 1272 (Ind. Ct. App. 1991)).

[32] Here, Husband was the one who wanted the Agreement to be executed, and Husband's attorney was the drafter of the Agreement. Wife, however, also had an attorney review the Agreement. The parties appear to agree that, if Exhibit A was attached, there would be no disagreement regarding the terms of the Agreement. At the hearing, Wife was asked if she would argue the Agreement should not be enforced if her Exhibit A was attached. Wife responded, "I probably wouldn't, I think that that [sic] document would make much more since [sic] as to what it says within the wording." Tr. Vol. III p. 19. In other words, the only reason for unconscionability would be the exclusion of Exhibit A. Wife is in the best position to identify the assets she owned prior to the marriage. We fail to understand Wife's contention that she cannot recall what property she owned prior to the marriage.

[33] The lack of an Exhibit A does not make the Agreement unconscionable. Even if the trial court believed the Agreement was unfair because Wife would receive less, this does not make the Agreement unconscionable. *See Rider*, 669 N.E.2d at 164 (concluding that, even in the case where "enforcement of this contract eventually may force [Wife] to sell her home, [it] cannot find enforcement of this antenuptial agreement to be unconscionable," and that the case "does not involve a situation where, following divorce, one spouse is left with

considerable assets while the other spouse is left virtually penniless, with no means of support"). Accordingly, to the extent the trial court found that the agreement was unconscionable, the trial court erred.

## Conclusion

The trial court erred in concluding there was not an enforceable prenuptial agreement between the parties. We reverse and remand.

Reversed and remanded.

Baker, J., and May, J., concur.