

**FILED**

Oct 30 2015, 10:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Donna Jameson
Greenwood, Indiana

ATTORNEY FOR APPELLEE

Stephen R. Lewis
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tina Carmer,<br>*Appellant-Respondent,*<br><br>v.<br><br>Scott Carmer,<br>*Appellee-Petitioner* | October 30, 2015<br><br>Court of Appeals Case No.<br>49A05-1411-DR-539<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Patrick L. McCarty, Judge<br><br>Trial Court Case No.<br>49D03-1401-DR-619 |

**Mathias, Judge.**

[1] Tina and Scott Carmer's marriage was dissolved in the Marion Superior Court. Tina appeals the dissolution decree raising five issues, which we consolidate and restate as:

> I. Whether the trial court abused its discretion when it failed to include Scott's annuity income in the child support calculation;
>
> II. Whether the trial court erred in interpreting the parties' prenuptial agreement and deviating from that agreement; and

III. Whether the trial court abused its discretion in its division of the marital liabilities.

[2] We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## Facts and Procedural History

[3] Tina and Scott were married in 1994, and three children were born to the marriage. The parties' oldest child is emancipated.

[4] Prior to the marriage, in 1988, Scott, who was a teenager at the time, was severely injured in an automobile accident. He suffered a brain injury, walks with a limp, and cannot use one of his arms. Monthly annuity payments from a structured settlement agreement are his main source of income. Scott also works as a greeter at Walmart and earns approximately $450 per week.

[5] Tina was not employed during the marriage but stayed home to raise the parties' children. Tina and Scott were also raising two foster children in their home and planned to adopt the children. After filing a petition to dissolve the marriage, Scott stated that he no longer wanted to adopt the children. Tina would like to adopt the children, but they were removed from her care after Child Protective Services ("CPS") was contacted regarding the condition of her home. Specifically, Tina allowed the family's pets to urinate and defecate in the house and did not clean up after the animals. Tina participated in services offered by CPS and is still attempting to adopt the children.

[6]     The parties entered into a prenuptial agreement on the day they were married. The agreement provides in pertinent part:

> In the event of a dissolution of the marriage or of a divorce, Wife agrees to accept in full and final settlement and satisfaction of all rights claims and interest that she may have whether by way of a division of the property of one or both of the parties (or alimony or a property settlement as it is sometimes referred to), and in every other way to the fullest extent permitted by law, of alimony, maintenance, rehabilitative maintenance, support or financial benefit of every kind.
> (a) Wife's separate property, and
> (b) One half (1/2) of all jointly held property, subject to one half (1/2) of all indebtedness thereon, including without limitation, mortgages and taxes; and
> (c) The following sums dependent upon the time of the commencement of the action: . . . If the date of the commencement of the action is: . . . more than 14 years [of the date of the marriage] Wife shall receive the total sum of: $70,000.

Ex. Vol., Petitioner's Ex. 2.

[7]     The parties own two homes, the marital residence and a rental property (the former marital residence), and several vehicles. They also have significant credit card debt, a loan on one of the vehicles, and mortgages on the real estate. During the marriage, the residences were refinanced on multiple occasions to assist in paying the parties' debts.

[8]     Throughout the marriage, Tina was in charge of the parties' finances. The parties incurred a significant amount of debt, and Tina admitted the family lived beyond their means. Scott periodically received lump sum payments from his structured settlement agreement totaling $350,000 in addition to the

monthly annuity payments. Nearly all of those funds were spent during the marriage. In 2013, Scott received a $150,000 lump sum payment. When the parties' separated, only $80,000 remained in the parties' bank account.

[9] Scott filed the petition for dissolution of marriage on January 10, 2014. He also filed a petition to enforce the parties' prenuptial agreement. The dissolution hearing was held on October 10, 2014, and the dissolution decree was issued on November 6, 2014. The decree provides in pertinent part:

> 5. The Petitioner shall pay Respondent the sum of One Hundred Fifty-One Dollars ($151.00) per week as child support for the parties' two minor children.
> 6. The aforementioned child support order is based on Petitioner's income from Walmart and the imputation of minimum wage to the Respondent. Given the fact that the Petitioner is presently not exercising overnights with the children he is given no overnight credit.
> 7. The child support order does not include any sums received by the Petitioner from his structured settlement by virtue of the Structured Settlement Protection Act and Section 104(a)(2) of the Internal Revenue Code which states: "gross income does not include . . . the amount of any damage received (whether by suit or agreement and whether as lump sums or as periodic payments on account of personal injuries or sickness.)"
>
> ***
>
> 13. The Respondent managed the parties' monies during their marriage.
> 14. The Respondent testified that all lump sum payments made to the Petitioner during the marriage from his annuities in the total sum of Three Hundred Fifty Thousand Dollars ($350,000) have been spent.
> 15. The Respondent shall receive all right, title and interest in the following vehicles: the Dodge, the Legacy and the Econoline van

which were titled in Petitioner's name and purchased with proceeds from his structured settlement. The vehicles are valued at Nine Thousand Three Hundred One Dollars ($9301.00), One Thousand Nine Hundred Thirty-Four Dollars ($1934.00) and One Thousand Two Hundred Twenty-Five Dollars ($1,225.00) respectively. The Petitioner shall receive credit for those sums as a deduction from the lump sum payment due to Respondent pursuant to the terms of the Prenuptial. . . .

\*\*\*

18. The Respondent shall receive all right, title and interest to her clothing and personal effects and the personal property in the marital residence excluding the kitchen appliances and window coverings. The furniture, pursuant to the terms of the Prenuptial, is deemed to be the property purchased by the Petitioner since the Respondent offered no evidence that she purchased the furniture from an account in her name alone. As a result, the Petitioner shall receive credit for the value of the furniture in the sum of Five Thousand Dollars ($5,000.00) as a deduction from the lump sum payment owed to Respondent pursuant to the terms of the Prenuptial.

\*\*\*

37. Petitioner introduced testimony and numerous exhibits substantiating the depreciation to the residence from the urine and feces damage done by Respondent's pets after Petitioner left the residence. The Respondent refuses to remove the pets from the residence.

\*\*\*

42. Respondent shall leave the marital residence in "for sale" condition (clean without any additional waste).
43. Petitioner shall sell the marital residence. Any net equity after payment of the mortgages, realtor's fees, closing costs and any principal payments paid on the mortgages by the Petitioner during the pendency of this matter, shall be split (should any exist).
44. Any reasonable repairs or damages resulting from Respondent's waste to the property required to be done for the

residence to be sold shall be deducted from Respondent's portion of the proceeds as shall any depreciation to the residence referenced in the purchase price of Two Hundred Ninety Nine Thousand Dollars ($299,000.00) less the sale price.

45. The parties' prenuptial provided for a payment to Respondent of Seventy Thousand Dollars ($70,000) after 14 years of marriage.

46. From this sum all payments for repairs and depreciation referenced in paragraph 42 [concerning the marital residence], should the residence be sold at a loss, shall be deducted and considered Respondent's dissipation of marital assets.

47. In addition so should the costs of attorney's fees and investigator's fees of Fifteen Thousand Dollars ($15,000.00) paid by Respondent from Petitioner's Structured Settlement Proceeds for the adoption of two children the Respondent lost custody of due to her negligence pursuant to a Court Order of the Marion County Juvenile Court. Respondent's loss of custody resulted from her lack of care of the children, the condition of the marital residence and its effect on the children which the Respondent allowed to occur when the children and the house were in her sole custody. As a result this was a dissipation of the marital assets.

48. In addition, there should be a deduction from the Seventy Thousand Dollars ($70,000.00) for the value of the furniture, Five Thousand Dollars ($5,000.00) and for the value of the automobiles referenced above, Twelve Thousand Four Hundred Sixty Dollars ($12,460.00) for a total of Seventeen Thousand Four Hundred Sixty Dollars ($17,460.00).

49. The remainder of the Seventy Thousand Dollars ($70,000.00), should there be any, shall be paid immediately [to] Respondent by the Petitioner upon closing of the marital residence (substantiation the loss or gain).

Appellant's Amended App. pp. 9-13. Tina appeals the dissolution decree.

Additional facts will be provided as needed.

## Standard of Review

[10] The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), and therefore, we apply a two-tiered standard of

review for clear error; that is, first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1075-76 (Ind. Ct. App. 2011) (citations omitted), *trans. denied*. We do not reweigh the evidence but consider the evidence favorable to the judgment. *Id*. Findings of fact are clearly erroneous when the record contains no facts to support them, and a judgment is clearly erroneous if no evidence supports the findings, the findings fail to support the judgment, or if the trial court applies an incorrect legal standard. *Bowyer v. Ind. Dep't of Natural Res.*, 944 N.E.2d 972, 983-84 (Ind. Ct. App. 2011). Although we review findings under the clearly erroneous standard, we review conclusions of law de novo. *Id*. at 983.

## Child Support Calculation

[11] Tina argues that the trial court erred when it failed to consider Scott's annuity payments under the structured settlement agreement as income when calculating his child support obligation. A trial court's calculation of child support is presumptively valid, and as such, we will reverse only where the determination is clearly erroneous or contrary to law. *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008).

[12] Indiana Child Support Guideline 1 provides that child support should be calculated to reflect the standard of living the children would have enjoyed had the marriage not been dissolved. Child Support Guideline 3(A) defines weekly gross income broadly and states in pertinent part:

"weekly gross income" is defined as actual Weekly Gross Income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon "in-kind" benefits. Weekly Gross Income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, inheritance, prizes, and alimony or maintenance received from other marriages. Social Security disability benefits paid for the benefit of the child must be included in the disabled parent's gross income. The disabled parent is entitled to a credit for the amount of Social Security disability benefits paid for the benefit of the child.

[13] In its calculation of his weekly gross income, the trial court did not include the $6,500 monthly payments Scott receives from his Structured Settlement Agreement. See Ex. Vol., Petitioner's Ex. 1. The trial court declined to include these funds in its calculation of Scott's weekly gross income:

by virtue of the Structured Settlement Protection Act and Section 104(a)(2) of the Internal Revenue Code which states: "gross income does not include . . . the amount of any damage received (whether by suit or agreement and whether as lump sums or as periodic payments on account of personal injuries or sickness.)"

Appellant's App. p. 9.

[14] However, the Indiana Child Support Guidelines provide a broader definition of income than the Internal Revenue Code. *See* Commentary to Ind. Child Supp. G. 3(A) (explaining that "in calculating weekly gross income, it is helpful to begin with total income from all sources. This figure may not be the same as

gross income for tax purposes"); *Harris v. Harris*, 800 N.E.2d 930, 939 (Ind. Ct. App. 2003) (stating "the definition of 'weekly gross income' is broadly defined to include not only actual income from employment, but also potential income and imputed income from 'in-kind' benefits"), *trans. denied*. Scott's settlement funds benefitted the family during the marriage and would have continued to benefit the family had it remained intact.

[15] In *Knisely v. Forte*, 875 N.E.2d 335, 340 (Ind. Ct. App. 2007), our court held that payments for personal injury may be included in the gross weekly income calculation. Also, Guideline 3(A) includes income from annuities in the definition of weekly gross income. While structured settlement payments are not specifically included in the Guidelines' definition of gross income, both annuities and structured settlement payments are certain sums of money paid periodically or yearly. *See* Black's Law Dictionary 1582 (10th ed. 2014) (defining a structured settlement as a party's agreement to pay periodic sums to the opposing party for a specified time or "those which provide for an initial cash payment followed by deferred payments in future years, normally on some annuity basis").

[16] For these reasons, we conclude that the trial court erred when it failed to include Scott's structured settlement payments in its calculation of his weekly gross income. We therefore remand this case to the trial court to include the structured settlement payments in its calculation of Scott's gross income or to provide justification for deviating from the Guidelines if the court declines to do so. *See* Commentary to Child Supp. G. 3(B) (stating "[w]hen the court deviates

from the Guideline amount, the order or decree should also include the reason or reasons for the deviation").

[17] Tina also argues that the trial court erred when it failed to address her request for child support retroactive to the date Scott filed the petition for dissolution. It is within the trial court's discretion to retroactively apply a child support award back to the date of filing or any date thereafter. *See Haley v. Haley*, 771 N.E.2d 743, 752 (Ind. Ct. App. 2002). On remand, we also direct the trial court to enter a finding concerning whether its child support order should be retroactive to the date of filing.

## Prenuptial Agreement

[18] Next, Tina argues that the trial court deviated from the parties' prenuptial agreement when it reduced the $70,000 payment payable to Tina under paragraph nine of that agreement.[1]

> Antenuptial agreements are legal contracts which are entered into prior to marriage which attempt to settle the interest each spouse has in property of the other, both during the marriage and upon its termination. This court has long held antenuptial agreements to be valid contracts, as long as they are entered into freely and without fraud, duress, or misrepresentation, and are not unconscionable.

*Rider v. Rider*, 669 N.E.2d 160, 162 (Ind. 1996). Neither party argues that their prenuptial agreement is invalid.

---

[1] The interpretation of a contract is primarily a question of law for the court and is reviewed de novo. *Boetsma v. Boetsma*, 768 N.E.2d 1016, 1020 (Ind. Ct. App. 2002), *trans. denied*.

[19] The prenuptial agreement provided that if the parties were married for more than fourteen years before the marriage was dissolved, Tina was entitled to her separate property, one half of "all jointly held property, subject to one half (1/2) of all indebtedness thereon," and a $70,000 payment from Scott. Ex. Vol., Petitioner's Ex. 2. The trial court awarded Tina $70,000 as provided in the parties' agreement. *See* Appellant's App. p. 13.

[20] The parties' only significant joint property was the martial residence and the former marital residence, which they maintained as a rental property. As agreed to by the parties in paragraph 9 of the prenuptial agreement, the trial court ordered the parties to sell both properties and to equally split the proceeds of the sales after payment of the mortgages, realtor's commissions, and closing costs.

[21] Yet, Tina claims that the trial court impermissibly modified the parties' agreement when it ordered that reasonable repairs required to be made to the marital residence prior to sale due to Tina's dissipation of the residence would be deducted from her "portion of the proceeds as shall any depreciation to the residence referenced in the purchase price of Two Hundred Ninety Nine Thousand Dollars ($299,000.00) less the sale price." Appellant's App. pp. 12-13. The parties' prenuptial agreement does not contain any provision addressing dissipation of martial assets. Therefore, the trial court did not

modify the parties' prenuptial agreement by holding Tina responsible for the damage she caused to the marital residence resulting in its diminished value.[2]

[22] Prior to the marriage, the parties also agreed that all property acquired by either of the parties:

> both prior to and subsequent to the contemplated marriage and all benefits, income, interests, rents, profits and gains and increases in value . . . which may in time accrue or result in any manner, shall remain and be the separate property of that party and subject entirely to his or her individual control and ownership the same as if he or she were not married.
>
> All household goods, furniture, fixtures, artwork, china, silver and the like acquired during the marriage shall be deemed the joint property of the parties if valued under One Thousand Dollars ($1,000.00). Such property valued over One Thousand Dollars ($1,000.00) shall be deemed to be the property of the Husband unless Wife has paid for such with a check drawn on an account in her sole name, a cashier's check or money order with her remitter or if Wife has other written evidence indicating the item was a gift, an inheritance or belonging to her. Each party herby waives, discharges and releases all right, title and interest in and to the property and Proceeds of the other party presently owned or hereafter acquired.

Ex. Vol., Petitioner's Ex. 2.

---

[2] Tina also argues that the trial court abused its discretion when it ordered that from the proceeds of the sale of the parties' real estate, Scott will be credited with the mortgage payments he makes while the properties are for sale before any remaining equity is split equally between the parties. *See* Appellant's Br. at 14; Appellant's App. p. 11. The prenuptial agreement simply provides that Tina is entitled to one half of "all jointly held property, subject to one half (1/2) of all indebtedness thereon[.]" *See* Ex. Vol., Petitioner's Ex. 2. Given his minimal Walmart income, Scott must presumably pay those mortgage payments from the proceeds of structured settlement, which under the prenuptial agreement, is solely his asset. Therefore, Tina has not persuaded us that the trial court abused its discretion by giving Scott credit for the mortgage payments made before the properties are sold.

[23] During the marriage, the parties used Scott's annuity payments to purchase vehicles and furniture. Accordingly, under the terms of the parties' agreement, any property valued over $1,000 is Scott's property. The furniture and vehicles at issue were all valued over $1,000.[3] See Ex. Vol., Petitioner's Ex. 6.

[24] On the date of the dissolution hearing, the vehicles and furniture were in Tina's possession. The parties' emancipated son was the primary driver of one of those vehicles. The furniture was in the marital residence, and its value had decreased to $5,000 because Tina allowed her animals to damage it. In her proposed division of the marital assets, Tina requested the furniture and two of the three vehicles. Ex. Vol., Respondent's Ex. Q.

[25] Because the trial court awarded Tina non-marital property, equity demanded that the court offset the value of that property against the amount owed to Tina under the prenuptial agreement. Accordingly, the trial court did not abuse its discretion when it awarded Tina the non-marital property she requested but also deducted the value of that property from the $70,000 settlement she was owed pursuant to the parties' agreement.

---

[3] Tina argues that the vehicles were titled in both her and Scott's names, and therefore, the vehicles, like the marital residence, are marital assets and not subject to the terms of the prenuptial agreement. However, the only evidence that the vehicles were titled jointly is the fact that they were listed as marital assets on Scott's financial declaration. *See* Ex. Vol., Respondent's Ex. B. The titles of the vehicles were not admitted into evidence. Therefore, we cannot conclude that the trial court abused its discretion when it determined that the vehicles were not marital assets.

## Tina's Attorney Fees for the CHINS Proceedings

[26] The trial court also found that Tina dissipated marital assets by taking $15,000 from Scott's 2013 Structured Settlement Payment to pay attorney fees incurred by Tina to defend the CHINS action that arose from Tina's neglect of her residence, which endangered the health of the children in her care. Tina appeals the trial court's decision to deduct that $15,000 from the sum owed to her under the prenuptial agreement.

[27] To support her argument, Tina relies on the following provision in the prenuptial agreement: "each party agrees that he or she shall not demand, claim, take or receive from the other, any attorney's fees or other litigation expenses . . . to which he or she might otherwise be entitled by reason of any rights arising out of or relating to the marriage and/or the relationship of the parties." Appellant's Br. at 14-15 (quoting Ex. Vol., Petitioner's Ex. 2).

[28] This provision is inapplicable to the issue before us. Neither party is demanding attorney fees from the other. Tina unilaterally took money from Scott's structured settlement payment to pay a debt that she incurred. Tina admitted that, during the dissolution proceedings, she neglected her residence, and as a result, CPS filed a CHINS action. Tr. p. 93. The trial court's decision to deduct the $15,000 from the $70,000 payment to which Tina is entitled under the terms of the prenuptial agreement is simply the trial court's attempt to make Scott whole from Tina's dissipation of marital assets.

## Credit Card Debt

[29]    Finally, Tina argues that the trial erred when it ordered her to pay approximately $5,000 owed total on the J.C. Penney and the Chase Slate credit card accounts. The division of marital property, which includes the parties' assets and liabilities, is a two-step process. First, the trial court must determine the property to be included in the marital estate. *Leever v. Leever*, 919 N.E.2d 118 124 (Ind. Ct. App. 2009). Indiana Code section 31-15-7-4(a) provides that "the court shall divide the property of the parties, whether: (1) owned by either spouse before the marriage; (2) acquired by either spouse in his or her own right: (A) after the marriage; and (B) before final separation of the parties; or (3) acquired by their joint efforts." "After determining what constitutes marital property, the trial court must then divide the marital property under the presumption that an equal split is just and reasonable." Leever, 919 N.E.2d at 124 (citing Ind. Code § 31-15-7-5). Finally, the division of marital assets and liabilities lies within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *Keown v. Keown*, 883 N.E.2d 865, 868 (Ind. Ct. App. 2008).

[30]    The trial court found that "the parties have substantial credit card debt which was primarily incurred by the Respondent who was in charge of the parties' finances." Appellant's App. p. 13. Scott's testimony supports this finding, and Tina's argument that she incurred most of the charges buying items for the children is simply a request to reweigh the evidence and the credibility of the witnesses, which our court will not do. *See Keown*, 883 N.E.2d at 868.

[31] Moreover, the trial court ordered Scott to bear responsibility for the parties' joint Fifth Third debt in the amount of $5433.54. Ex. Vol., Petitioner's Ex. 10, Appellant's App. p. 13. Also, it is reasonably likely that the marital residence will be sold at a loss for which Scott will be financially responsible.

[32] For all of these reasons, the trial court did not abuse its discretion when it ordered Tina to bear responsibility for the debt incurred on the Chase and J.C. Penney credit cards.

## Conclusion

[33] The trial court did not err when it interpreted the parties' prenuptial agreement. The trial court also did not err when it subtracted certain sums from Tina's $70,000 payment under the terms of the agreement after the court awarded her non-marital assets at her request and due to her dissipation of Scott's structured settlement payments. However, the trial court erred when it failed to consider Scott's structured settlement payments in its calculation of Scott's gross income for the purposes of child support. We therefore remand this case to the trial court for proceedings consistent with this opinion.

[34] Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

May, J., concurs.

Robb, J., concurs in result in part with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tina Carmer,<br>*Appellant-Respondent,*<br><br>v.<br><br>Scott Carmer,<br>*Appellee-Petitioner* | Court of Appeals Case No.<br>49A05-1411-DR-539 |

**Robb, Judge, concurring in result in part.**

[1]   I write separately to address only the first issue: whether the trial court abused its discretion when it failed to include Scott's monthly structured settlement payments as income in the calculation of child support. The majority holds the trial court abused its discretion when it failed to include Scott's monthly structured settlement payments in calculating his weekly gross income, citing the definition of "weekly gross income" in Indiana Child Support Guideline 3(A) and the decision in *Knisely v. Forte*, 875 N.E.2d 335 (Ind. Ct. App. 2007), that a personal injury settlement may be included in the weekly gross income figure. *See* slip op. at ¶ 15.

[2]   I agree with the majority that Guideline 3(A) defines weekly gross income as "income from any source," and that it is a broader definition than the Internal Revenue Code definition of gross income, on which the trial court relied in

excluding Scott's structured settlement payments from his weekly gross income. However, I do not believe *Knisely* is particularly helpful in determining whether Scott's structured settlement payments are includable in his weekly gross income. *Knisely* was concerned with how to treat a one-time payment in settlement for an injury which left the father permanently disabled and unable to work. Here, despite the serious injuries Scott sustained several years before the marriage, he holds a steady job earning a weekly income of approximately $450 per week in addition to his monthly structured settlement payments. Although *Knisely* held the trial court did not abuse its discretion in considering the one-time payment when calculating the father's child support obligation, it appears the father may have had no other means of supporting his children. Further, the opinion does not parse how the trial court calculated the father's weekly income based upon the settlement amount. So although *Knisely* stands for the general proposition that it is not an abuse of discretion to consider some part of a lump-sum settlement in determining a party's child support obligation, it does not specifically help us determine whether the trial court in this case erred in how it handled Scott's structured settlement payments.

[3]  We are concerned with determining Scott's weekly gross *income*. "Income" is defined as "[t]hat which comes in as the periodical produce of one's work, business, lands, or investments . . . ."  Oxford English Dictionary, OED Online, http://www.oed.com/view/Entry/93645?rskey=tQFSVL&result=1#eid. Personal injury settlements may include an income-replacement component, but there is no indication that the entire settlement in this case was for that

purpose. In fact, Scott is able to and does work a regular job, at least currently. But personal injury settlements are also intended to reimburse past and future medical expenses, disability, pain and suffering, caretaking, and other extraordinary expenses arising from an injury. Scott testified that he suffered a severe head injury which impacts his memory and leaves him at greater risk for developing Alzheimer's, Parkinson's, or dementia in the future, tr. at 45, and injuries to his leg and arm which restrict his physical activities, *id.* at 6-7. In addition, he is currently undergoing occupational therapy several times a week for which he pays directly. *Id.* at 62-63. To date, none of his structured settlement proceeds have been set aside for his future medical care or retirement. *Id.* at 40. Other courts which have addressed similar situations have taken the position that only those portions of a personal injury settlement that are meant to compensate for lost wages or future wage loss are "income" for child support purposes even under an expansive definition of "income." *See, e.g.*, *Villanueva v. O'Gara*, 668 N.E.2d 589, 592-96 (Ill. Ct. App. 1996) (interpreting Illinois's statutory definition of net income for child support purposes, Ill. Comp. Stat. 5/504 (net income is "the total of all income from all sources"), and holding it was error for the trial court to include the entire personal injury settlement amount in the child support calculation; also citing cases from several other jurisdictions deciding this issue).

[4] Scott earns a weekly wage from employment, and I therefore do not necessarily think the trial court would have abused its discretion in excluding the structured settlement payments from a calculation of Scott's weekly gross income had it

not based that exclusion solely on the Internal Revenue Code definition of gross income. As the majority notes, the Internal Revenue Code is not the standard for determining weekly gross income for child support purposes, *see* slip op. at ¶ 13 (quoting Child Supp. G. 3(A), cmt. 2(b) that the weekly gross income figure may not be the same as gross income for tax purposes). It may be unfair to exclude all of the settlement proceeds where they have inured to the family's benefit in the past but it may also be unfair to include all of the proceeds where Scott has need of them for his own care. Commentary to Guideline 3(A) urges judges to "be innovative in finding ways to include income that would have benefited the family had it remained intact, but be receptive to deviations where reasons justify them." Child Supp. G. 3(A), cmt. 2(b); *see also Harris*, 800 N.E.2d at 940-41 (holding the trial court did not abuse its discretion in including only the net amount of settlement proceeds from a wrongful termination lawsuit because that is the amount that "would have ultimately benefited the children if the family had remained intact.").

[5] Because the trial court's decision was based on an improper legal standard, and subject to the caveat that the trial court should have the leeway on remand to make an "innovative" determination regarding the inclusion or exclusion in whole or in part of Scott's structured settlement payments, I concur in result as to the child support issue. As to the remainder of the opinion, I concur in full.